[No. 26948. Department Two. March 10, 1939.]

J. O. LASHER, *Appellant,* v. W. A. WHEELER *et al., Respondents.*[1]

[1]Reported in 87 P. (2d) 982.

*J. W. Bryan,* for appellant.

*Lawrence Seltzer,* for respondents.

ROBINSON, J.—This action was brought by J. O. Lasher against W. A. Wheeler and wife to collect a promissory note. The note, dated April 28, 1933, is set out in full in the complaint and purports to have been given by W. A. Wheeler to J. O. Lasher, promising to pay, upon demand without grace, to the order of Lasher, $1,062.18, with interest at seven per cent per annum from January 1, 1932. It contains the ordinary provision for reasonable attorney's fee in case of suit. It was alleged that no part of the note had been paid, and judgment was asked for principal, interest, and costs, including one hundred dollars as attorney's fee.

The defendants admitted that W. A. Wheeler executed the note, but set up affirmatively (1) that it was executed and delivered without consideration; and (2) under duress and while Wheeler was in ill health and of nervous and agitated state of mind.

A jury trial resulted in favor of the plaintiff, the verdict being returned on March 29, 1937. On March 31st, the defendants filed a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. There is a minute entry in the transcript,

dated April 10, 1937, reading: "Motion for a new trial denied," but saying nothing as to the motion for judgment notwithstanding the verdict. It appears that, in April, the plaintiff presented a formal judgment, in accordance with the verdict, for the trial court's signature, which the trial court marked: "Presented and refused." On October 6, 1937, the court entered a formal order denying the defendants' motion for a new trial and granting them judgment notwithstanding the verdict.

The statement of facts, although properly certified, is an extremely unsatisfactory document. It seems that there was no regular stenographer in attendance, and the appellant prepared a statement of facts from recollection. To this, respondent took numerous exceptions, many of which the court allowed. It further appears that a stenographer had voluntarily attended the trial and taken a part of the testimony for the sake of practice. Her notes, or a portion thereof, were proposed as amendments. These notes, the statement originally proposed, and a sheaf of affidavits used in the post-trial controversy, together with certain interlined comments in longhand inserted by the trial judge, plus the exhibits introduced in evidence, make up the statement.

We gather from an examination of the statement that, early in 1932, the respondents sold to the appellant Lasher a tract of land on Hood Canal for the sum of seven hundred dollars. A deed was executed and delivered which conveyed the right quantity, but, apparently, not the exact land which the appellant thought he was buying, and, we add, that the respondents thought they were selling; for, although the appellant's brief speaks of Mr. Wheeler as a "cranially depressed, physically-ill and quondam very scared 'constructive' swindler," and as well meriting criminal

prosecution, we think the evidence shows that he was guilty of no more than being honestly mistaken as to his boundaries. The parties visited the land together before the sale. Wheeler, when testifying as an adverse witness, was asked what he said to Dr. Lasher concerning where the boundaries were:

"A. There was a known corner to the property considerably back from the canal. I pointed this out to Mr. Lasher. I told him that I could not find the next corner toward the canal and that there should have been also a meander corner which I also could not find. I told Mr. Lasher that in order to run a correct line we would have to go clear across Hood Canal and pick up a known corner and that this would probably cost in the neighborhood of $100 or more. Mr. Lasher was averse to spending the $100. However the logging company was logging up to the known corner and along the line which had been blazed which I believed was probably the line, and I pointed that out to Mr. Lasher. Both the logging company and myself and Mr. Lasher also accepted that as the line, but I distinctly impressed on Mr. Lasher that the only way an accurate line could be run was to go across the canal, and I had no money with which to do that. Mr. Lasher thought the fact that both the logging company and myself accepted that as the line was sufficient."

Dr. Lasher's testimony was substantially to the same effect. On cross-examination, he testified, in part, as follows:

"Q. When Mr. Wheeler pointed out the line which you subsequently found to be incorrect, did he tell you that was the line or that he thought it was the line? A. He said he thought it was the line. Q. Did he mention to you that there was one known corner from which the survey line, which would definitely determine the line, would have to be run? A. He did. Q. Did he tell you that one of the corners was unknown, the stick or post having been removed? A. Yes. Q. Did he explain to you what a meander corner was? A. He did. Q. What is a meander cor-

ner? A. I understand that it is a corner which is placed when for some reason a survey has to be carried over a river or body of water. Q. What was there a meander corner in this case as far as you could determine? A. No. Q. Did Mr. Wheeler advise you that the meander corner was missing? A. Yes. Q. Did he advise you that because the meander corner was missing that it would be necessary to go clear across the Hood Canal and pick up a known corner on the other side of the canal before any survey line could be run? A. He did. Q. Did he tell you that it would cost money? A. He said it would be quite expensive. Q. Did he tell you that he had any money with which to make such a survey? A. Mr. Wheeler did not have any money. Q. Why did you not make such a proper survey line? A. I did not think it was necessary. . . . Q. Did Mr. Wheeler point out to you an old blazed line up to which a logging company was logging? A. He did. Q. Were the logging people accepting that line as the line to which the property subsequently sold to you extended? A. That is correct. Q. So that the place where Mr. Wheeler believed the line lay was also the place where the logging people believed the line lay? A. That is true."

It turned out that both Mr. Wheeler and the "logging people" were wrong in their belief as to where the line lay. On March 24, 1932, Dr. Lasher wrote Wheeler that a man named Young had bought the property to the west; and, upon a survey, it appeared that Young's east line took forty feet off the west side of the lot he supposed he had bought. Continuing, he said:

"I have the lot sold but naturally had to tell the party about this survey, which held up the sale until it is settled, if that is done soon enough. Could have let the deal go through and later stood a law suit but believe that would have been too expensive. . . . Of course the lot is no good to me if the line is any East of where you told me. Also their line cuts off all the land I have cleared and takes most of the creek."

On April 11th, Mr. J. W. Bryan, Sr., as attorney for Dr. Lasher, addressed a letter to Mr. Wheeler in which he recited Lasher's grievance, stated that he had been engaged to demand a settlement, and said, among other things:

"He is willing to quit claim back to you the property you deeded him, but he demands the refund of the money he paid you. He is also entitled to damages. He will make a liberal settlement if he can without going to court."

Evidently, Dr. Lasher later dealt with Wheeler personally and arrived at an agreement regarding the matter. On April 28, 1933, Mr. Bryan wrote to Mr. Wheeler, saying in part:

"I enclose an On Demand Note according to agreement which you are to sign and return.

"Please let me have this note properly signed by return mail."

Referring to this letter, Dr. Lasher, under examination by his own counsel, testified as follows:

"Q. Prior to this letter, had you made demand on him for a refund of the money? A. Yes, I had made many demands. I had told him that the strip of land which I owned was practically worthless to me; that I would gladly reconvey the property to him if he would pay me back what I was out. Q. How did he come to give you this note? A. He told me that he had had bad luck; that he had no property and was unable to pay me anything but offered to give me a note and declared that he would eventually pay every cent of it back to me."

It appears from affidavits made a part of the record that, when the defendants' post-trial motions came on for hearing on April 10th, the trial judge stated that he would deny the motion for a new trial, and that he would, also, deny the motion for judgment notwithstanding the verdict, *on condition, however,* that the plaintiff would first convey the land to the defendants.

It further appears from the record that the trial judge had arrived at the conclusion that the parties had entered into an agreement to rescind the purchase and sale by the terms of which agreement the defendants were to receive back the land, and the plaintiff, in lieu of the purchase price, was to receive from the defendants Wheeler's note for $1,062.18. Such a contract contemplates concurrent performance. The plaintiff received the note, but he had not conveyed the land, and, therefore, speaking in a broad sense, the defendants had not received the consideration for the note. The trial judge was willing to allow the plaintiff to still furnish it, but was unwilling to allow him to keep the land and recover on the note as well.

The matter came before the court repeatedly during the summer of 1937. Plaintiff offered a deed, which the trial court would not approve. The trial judge, on the other hand, offered to approve a deed containing the following condition:

"This conveyance is executed on the condition that grantors retain a lien against said property to the extent of the sale price on execution sale on that certain judgment in Cause No. 295383 in Superior Court of King County, Washington, entitled J. O. Lasher, plaintiff, vs. W. A. Wheeler and Lillie E. Wheeler, his wife, in which case the plaintiff secured judgment against the defendants in the sum of $1062.18, with interest, costs and attorney's fees. This lien is allowed on the further condition that execution sale be held within four months from the date hereof."

Such a deed the plaintiff would not give. He offered, if allowed to keep the land, to credit $250 on the judgment, when and if entered, although contending, and there was evidence to this effect, that the land was worth no more than one hundred dollars. The defendants claimed it to be worth one thousand dollars. He also offered to arbitrate the value of the land and

credit the value found by the arbitrators on the judgment, if and when entered. His tenacity in holding onto the land may, perhaps, be accounted for by an excerpt from one of the affidavits made by his counsel, to wit:

"The judgment obtained is worthless. The defendants are judgment proof. As attorney for plaintiff I will cheerfully satisfy the judgment for the payment of $100.00 therefor. I know of no property owned by the defendants that is subject to execution. I am informed by the defendants' attorney that he is an old age pensioner or an applicant for an old age pension and that the defendants are judgment proof."

Finally, according to the trial court's statement (denied by plaintiff's attorney in the briefs), the plaintiff refused to make a deed and withdrew all offers in open court, and, on October 6th, the court entered an order granting the defendants judgment notwithstanding the verdict, and entered judgment in accordance therewith.

On appeal, the judgment is attacked for a number of reasons. It is vigorously argued that the trial court lost all jurisdiction of the cause when it announced that it would not grant a new trial, citing *Wagner v. Northern Life Ins. Co.,* 70 Wash. 210, 126 Pac. 434, 44 L. R. A. (N. S.) 338, and similar cases construing the statutes as they existed prior to the enactment of chapter 65, Laws of 1921, p. 199, repealing the former statutes and substituting a new procedure as to the entry of judgments. The law, as then enacted, is carried in Rem. Rev. Stat. as § 431 [P. C. § 8081]. It appears from the record that the defendants complied with the statute. Their motion was filed within two days after verdict. The motion for a new trial was promptly disposed of, but no final disposition was made of the motion for judgment not-

withstanding the verdict until October 6th. At that time, no judgment had been entered. On that day, judgment followed in due order, all as prescribed in § 431.

██ It is also vigorously contended that the trial judge had no right, authority, or jurisdiction to prescribe a condition with reference to the granting, or refusal to grant, a motion for judgment notwithstanding the verdict. He had jurisdiction of the cause, and it was his duty to enter a proper judgment therein. We think he did so. The lower court, under the circumstances which faced it, followed the example set by this court under similar conditions in *French v. C. D. & E. Inv. Co.*, 114 Wash. 416, 195 Pac. 521, except that it was able to act by way of prevention, while this court acted by way of cure, after review. We quote from that decision:

"However, the judgment, as it is, cannot stand. It allows respondents to recover a certain sum of money but made no provision whatever concerning the land. As the case now stands, the respondents have the title to the land and also a judgment for all of the money which went to pay for it. Manifestly, this situation cannot be upheld. . . .

"If, within thirty days immediately following the filing of the remittitur in the lower court, the respondents make good their tender of the deed by depositing the same in this cause, with the clerk of the superior court, for the appellants, the judgment appealed from will stand affirmed; otherwise it is reversed and the case remanded with directions to dismiss the action."

The appellant was not entitled to both the land and the judgment. He was given his choice, which, in view of the fact that he had failed to make any sort of a tender, was rather more than he was strictly entitled to.

The judgment is affirmed.

MAIN, BEALS, and MILLARD, JJ., concur.

BLAKE, C. J. (dissenting)—I dissent. From the facts stated in the opinion, the consideration for the note is apparent. There is no evidence of duress. The fact that the trial court felt that appellant should not be permitted to recover on the note and keep the land afforded no legal justification for its refusal to enter judgment on the verdict.